216 F.2d 212
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
J. E. McCATRON, R. F. Nine and M. M. Dinkel, Co-partners,
d/b/a Price Valley Lumber Co., and J. E. McCatron, R. F.
Nine, Loren Weeks and Lloyd Urquarht, Co-partners, d/b/a
Idaho Pine Moulding Co., Respondents.
 No. 14166.
 United States Court of Appeals, Ninth Circuit.
 Oct. 13, 1954.
 
 George J. Bott, Gen. Counsel, David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Bernard Dunau, Thomas R. Haley and Frederick Reel, Attys., N.L.R.B., Washington, D.C., for petitioner.
 Eli A. Weston, Boise, Idaho, for respondents.
 Before BONE, ORR and POPE, Circuit Judges.
 
 
 1
 ORR Circuit Judge.
 
 
 2
 Price Valley Lumber Company and Idaho Pine Moulding Company are partnerships. Price Valley has its principal office in Tamarack, Idaho, and engages in the business of logging, and the operation of a sawmill and a planing mill. Idaho Pine is a small operation in which the major partners in Price Valley own a half interest. It was organized for the purpose of salvaging some profit from the 'edgings' which are a by-product of the Price Valley mill operations through the manufacture of mouldings. Idaho Pine operates in a separate building on the Price Valley premises. It has three employees, two of whom work in the Price Valley planing mill. Its books are kept by a Price Valley employee and its pay checks are drawn on Price Valley. Idaho Pine receives all its power and raw materials from Price Valley. During the period relevant to this case a common control of labor relations existed between the two partnerships. The National Labor Relations Board decided that the two partnerships should be treated as one employer within the meaning of § 2(2) of the National Labor Relations Act, 29 U.S.C.A. § 152(2), hereafter the Act. The Board's ruling in this regard is correct and it properly exercised jurisdiction as to both. After a hearing, the Board found that respondent partners had violated § 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158(a)(1, 3), and entered a cease and desist order. It required the partnerships to take affirmative action by offering reinstatement to certain discharged employees, making them whole for loss of pay, and posting appropriate notices. The Board's decision and order are reported in 106 N.L.R.B. No. 8.
 
 
 3
 The facts disclose that prior to July 24, 1952, there had been no significant union activity among the employees. An organizational drive was commenced on that date. On August 11th the Union filed a representation petition. On August 13th it held a meeting for the purpose of enrolling members and collecting dues. At this meeting employee Patton engaged in a heated altercation with an uninvited guest, Stanley Whetmore, the son of sawmill foreman Walt Whetmore. When in the course of this altercation Patton stated that he would not quit but would have to be fired, Stanley Whetmore replied: 'That can be arranged.'
 
 
 4
 On the next day, August 14th, Patton was discharged by Cooper, the planing mill foreman, for reasons which the Trial Examiner found to constitute good cause. Cooper did not at that time know of the incident of the preceding night. Patton informed the planing mill employees of his discharge and the union men in the planing mill erroneously concluded that Patton had been discharged for union activity and in consequence of the incident of the preceding night. At this time employee Murphy, the spokesman for what we shall designate the Murphy group, informed Ingle, the yard foreman and sales manager, that the Murphy group was 'striking in protest of Jimmy (Patton) being fired, and for recognition of the A.F.L. as our bargaining agent.' The Murphy group then left the premises and went to the nearby town of New Meadows.
 
 
 5
 A little later the union men working in the sawmill, hearing of the incident, determined that they too should walk out. As they left the sawmill they met Nine, one of the partners. Nine said he thought the thing could be straightened out. It was agreed that these men should go back to work and that the Murphy group should be rounded up and brought to the plant. The Murphy group returned from New Meadows. The situation remained static awaiting the arrival of McCatron, a partner holding a majority interest in the business, who was coming from the woods to the mills. He arrived in late afternoon. The employees by that time had deployed into two groups, the Murphy group with some additions and the remainder of the employees in a group we shall designate as the sawmill group, composed of men who did not want to walk out. McCatron first spoke briefly with the sawmill group. He then approached the Murphy group and said: 'I am sorry fellows, my keymen won't work with you. There will be no Union in this plant. There will be no meeting held here. Therefore, go to the office and pick up your time.' Employee Baker then asked: 'You mean we are fired?' McCatron replied: 'That is right. Get your checks.'
 
 
 6
 Respondents' version is that the employees were not discharged but quit. McCatron testified that he said, '* * * now under the circumstances you boys have quit and I can't put you back to work * * *.' The Trial Examiner found otherwise and his findings are clearly supported by substantial evidence.
 
 
 7
 The Board ruled that McCatron's discharge of the Murphy group violated § 8(a)(1) and (3) of the Act. We agree that McCatron's action in discharging the men without replacing them violated § 8(a)(1) and, that being so, it follows that under the circumstances of this case there was also a violation of § 8(a)(3).
 
 
 8
 Section 8(a)(1) provides that it shall be an unfair labor practice for an employer 'to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7'. Section 7 provides, in part, that employees shall have the right '* * * to engage in * * * concerted activities for the purpose of * * * mutual aid or protection.' 29 U.S.C.A. § 157. In the case of N.L.R.B. v. Globe Wireless, Ltd., 1951, 193 F.2d 748, this Court held that a strike called to bring about the reinstatement of an employee properly discharged for insubordination was a concerted activity protected by § 7 of the Act. In the instant case we have the additional fact that the strikers mistakenly but in good faith thought that the employee whose reinstatement they sought had been discharged because of union activities. Some of the strikers testified that they feared that unless effective action was taken they too would be discharged because of their union activity. The walkout was a concerted activity protected by § 7. The discharge of the employees participating in the walkout by McCatron without having first replaced them interfered with, restrained, and coerced the employees in the exercise of that concerted activity.
 
 
 9
 Had the strikers been correct in their assumption that Patton was discharged for union activities, the strike would have been an unfair labor practice strike. In that event the respondents could neither discharge nor replace them. See N.L.R.B. v. Remington Rand, Inc., 2 Cir., 1942, 130 F.2d 919, 927-928. But since Patton was discharged for good cause the strike should be classed as an economic strike. As economic strikers the men who had walked out could have been replaced. See N.L.R.B. v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 345-346, 58 S.Ct. 904, 82 L.Ed. 1381. But they could not be discharged without first being replaced. N.L.R.B. v. Globe Wireless, Ltd., 9 Cir., 1951, 193 F.2d 748, and authorities cited; N.L.R.B. v. Buzza-Cardozo, 9 Cir., 1953, 205 F.2d 889, certiorari denied 346 U.S. 923, 74 S.Ct. 310; N.L.R.B. v. Cowles Publishing Co., 9 Cir., 214 F.2d 708.
 
 
 10
 Respondents contend that since McCatron acted under compulsion of the non-strikers, who announced that they would not work with the strikers, he did not commit an unfair labor practice. Although McCatron was placed in a difficult position and may well have been motivated by a desire to keep his business in operation, such a motivation does not relieve the employer from a violation of § 8(a)(1). It is the effect and not the motivation of his action which determines whether he has violated § 8(a)(1). See N.L.R.B. v. Longview Furniture Co., 4 Cir., 1953, 206 F.2d 274, 276.
 
 
 11
 Under the standards set forth in Radio Officers' Union of Commercial Telegraphers Union, A.F.L. v. N.L.R.B., 1953, 347 U.S. 17, 74 S.Ct. 323, McCatron's action in discharging the strikers violated § 8(a)(3) as well as § 8(a) (1). Section 8(a)(3) provides that it shall be an unfair labor practice for an employer, 'by discrimination in regard to hire or tenure of employment * * * to encourage or discourage membership in any labor organization'. Since the discharged employees were union men striking to bring about the reinstatement of an employee they thought had been discharged for union activity, the discharges had a natural tendency to discourage union membership. Such a natural tendency establishes the intent required in finding a violation of § 8(a) (3). Radio Officers' Union, supra, 347 U.S. at pages 44-52, 74 S.Ct. at pages 337-342. Section 8(a)(3) also requires that the discharges constitute discrimination. We have held the respondents' discharge of the striking employees unlawful as a violation of § 8(a)(1). As such it was discriminatory and also violated § 8(a)(3).
 
 
 12
 The Trial Examiner found a violation of § 8(a)(1) in the conduct of supervisory personnel by the interrogation of employees and in a statement to the effect that if the Union came the plant would go on a forty-hour week. The Board affirmed the Trial Examiner's finding, as based upon four incidents.
 
 
 13
 Two of these incidents involved statements by supervisors that if the Union came the plant would go on a forty-hour week. The employees had been working fifty to fifty-five hours per week. The Board construed these statements as threats of loss of pay caused by shorter working hours. Section § 8(c) of the Act provides that 'The expressing of any views, argument, or opinion * * * shall not constitute or be evidence of an unfair labor practice * * * if such expression contains no threat of reprisal or force or promise of benefit.' We take note of the provision of 8(c) and of the fact that it is often difficult to distinguish a threat from a prediction. An employer may predict unfavorable consequences of unionization without committing an unfair labor practice if he can do so in a manner which contains no threat. However, the Board's finding that the statements concerning loss of working hours constituted threats is a reasonable one.
 
 
 14
 Two incidents of interrogation are complained of. One of these incidents concerns a statement of foreman Cooper to employee Murphy, towit: 'I have heard, Murph, that you were trying to get a union in here.' The other incident occurred when the following conversation took place between partner Nine, employee Don Matthews, and foreman Whetmore:
 
 
 15
 'Nine: Don, what do you know about this union business?
 
 
 16
 'Matthews: Nothing.
 
 
 17
 'Nine: That's fine. It seems like everybody you talk to don't know nothing about it.
 
 
 18
 'Whetmore: Don, I understand you are the man that brought the union man here.
 
 
 19
 'Matthews: No, I am not the man that brought him in here.
 
 
 20
 'Nine: It seems like everything that is did around here gets blamed onto Don.'
 
 
 21
 We fail to detect a threat in the said statements even when considered in connection with the overall conduct of respondents.
 
 
 22
 Interrogation regarding union activity does not in and of itself violate § 8(a) (1). This holding may be at variance with that of the Board as expressed in Standard-Coosa-Thatcher Co., 1949, 85 N.L.R.B. 1358. We are of the opinion that in order to violate § 8(a)(1) such interrogation must either contain an express or implied threat or promise, or form part of an overall pattern whose tendency is to restrain or coerce. We so held in Wayside Press, Inc., v. N.L.R.B., 9 Cir., 1953, 206 F.2d 862. Other circuits have taken the same view. N.L.R.B. v. Associated Dry Goods Corp., 2 Cir., 1954, 209 F.2d 593; N.L.R.B. v. Syracuse Color Press, Inc., 2 Cir., 1954, 209 F.2d 596; N.L.R.B. v. Montgomery Ward & Co., 2 Cir., 1951, 192 F.2d 160; N.L.R.B. v. Superior Co., 6 Cir., 1952, 199 F.2d 39, 43; Sax v. N.L.R.B., 7 Cir., 1948, 171 F.2d 769; N.L.R.B. v. Arthur Winer, Inc., 7 Cir., 1952, 194 F.2d 370; N.L.R.B. v. England Bros., Inc., 1 Cir., 1953, 201 F.2d 395.
 
 
 23
 The decision of this court in N.L.R.B. v. West Coast Casket Co., 9 Cir., 1953, 205 F.2d 902, upon which the Board relies, is not to the contrary since the interrogations there found to violate § 8(a)(1) occurred against a background of coercive conduct.
 
 
 24
 The order of the Board is modified so as to strike from the notice paragraph 3. As so modified the order will be enforced.